1

2

3                           UNITED STATES DISTRICT COURT

4                          NORTHERN DISTRICT OF CALIFORNIA

5

6

7

8    DARYL LIPSKA,                              Case No.  11-1308 JST (PR)
                        Petitioner,
9                                               **ORDER DENYING PETITION FOR**
        v.                                      **WRIT OF HABEAS CORPUS;**
10                                              **DENYING CERTIFICATE OF**
     GREG LEWIS, Warden                         **APPEALABILITY**
11                      Respondent.

12

13

14

15          Before the Court is the petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. §

16   2254 by Petitioner Daryl Lipska, challenging the validity of a judgment obtained against him in

17   the Monterey County Superior Court.  Respondent filed an answer to the petition.  Petitioner has

18   filed a traverse.  For the reasons discussed below, the petition is DENIED as to all claims and a

     certificate of appealability is DENIED.

19                                    **PROCEDURAL HISTORY**

20          On April 5, 2006, the Monterey County District Attorney filed an information charging

21   Petitioner with the following counts: (1) Count 1: first degree murder with the special

22   circumstances of arson and burglary and an enhancement for the personal use of a deadly weapon,

23   a knife; (2) Counts 2, 3, 4, and 5: attempted premeditated murder with enhancements on Count 2

24   for the personal use of a deadly weapon, a knife, and the infliction of great bodily injury; (3)

25   Count 6: arson of an inhabited structure; (4) Count 7: first degree burglary; and (5) Counts 8, 9

26   and 10: child endangerment.  On February 15, 2007, the jury found Petitioner guilty of Counts 8, 9

27

28

United States District Court
Northern District of California

and 10 and a mistrial was declared as to the other Counts.  Respondent's Ex. A, Clerk's Transcript (CT) at 801-09; Ex. B, Reporter's Transcript (RT)  (Vol. 18) at 43-46.

On June 4, 2008, the District Attorney filed an amended information adding Count 11, solicitation to commit perjury.  CT at 801-09.  On June 23, 2008, the second jury found Petitioner guilty on all the remaining Counts and all of the enhancements.  CT at 832-42; RT (Vol. 15) at 4202-09.

On August 1, 2008, the trial court sentenced Petitioner to the indeterminate term of life without parole, consecutive to two indeterminate terms of life with the possibility of parole, consecutive to the determinate term of eight years.  CT at 917-21; RT (Vol. 16) at 4508-10.

On December 15, 2009, in an unpublished opinion, the California Court of Appeal affirmed the judgment.  Respondent's Ex. F, People v. Lipska, 2009 WL 4856789 (Cal Ct. App. Dec. 15, 2009) (unpublished).   On March 24, 2010, the California Supreme Court summarily denied the petition for review.  Respondent's Ex. H.

On March 18, 2011, Petitioner filed the instant federal petition for a writ of habeas corpus. The matter is now fully briefed and is ready for review on the merits.

## STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal.[1]

### The Prosecution's Evidence

In November 2005, Tonia Bone and her putative spouse Billy White lived in a mobile home on Blackie Road in Prunedale with their sons J. (age three) and A. (age one), and Tonia's daughter C. (age 11).  FN3 The family had a pit bull named Sirus that they kept tethered outside in the front yard.  The mobile home sat next to a house that had been the childhood home of Tonia and defendant, her older half-brother, until defendant went to live with his grandparents at the age of 14 or 15. That house was condemned and Tonia used it for storage.  Vernon and Donna Silva lived in a mobile home on the same property.

FN3:   As some of the witnesses have the same last name, in order to avoid confusion and not out of any disrespect, we will refer to some of the witnesses by their first name.

[1] This summary is presumed correct.  See Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

United States District Court
Northern District of California

2

In November 2005, defendant worked as a handyman.  He and his girlfriend Elena Gutierrez lived together in an apartment.  They had previously lived with Elena's parents for some time until Elena broke up with defendant because he started using methamphetamine.  After defendant stopped using drugs and rented the apartment in early November 2005, Elena moved in with him.  Defendant did not like Tonia, and stopped seeing her around 2003 or 2004 after Tonia and Billy started using methamphetamine.  Elena, a children's mental health counselor, had never met Tonia, but she had heard about Tonia from defendant.

On November 29, 2005, Elena and defendant spent the day together.  Elena cleaned the apartment and cooked beans.  She cut up an onion to put in the beans using a 12-inch-long kitchen knife with a black handle.  That night, after defendant and Elena had gone to bed, defendant got up around midnight.  He told Elena that he was going to get some fresh air and he left in his truck.  He was wearing a black jacket, jeans, and tennis shoes.  When he came back he said it had been good to get some fresh air.  He undressed and went back to bed, and Elena fell asleep.  At some point, defendant woke Elena up again.  He was sweating profusely and the bed was wet.  Elena changed the sheets and they went back to sleep.

On November 29, 2005, after C.'s school let out, Tonia and her family went to get their Christmas tree.  They did not put it up, however, because it was late; they left it in the back of their truck.  They ate dinner and then watched a movie in the living room.  C. was on the couch, J. and A. were on cushions on the floor, and Tonia and Billy were on a mattress.  Tonia had a blanket around her, but nothing else on.  C. fell asleep before the movie ended.

C. woke up when her mother stepped on her foot and Sirus started barking.  Tonia looked out the window and said that it might be M.J., which is what the family calls their friend James Martin.  C. looked out the window and saw Sirus holding onto the jacket sleeve of a man, but she could not tell who the man was.  Billy got up, put on some sweats, opened the door, looked out, and said, "Hey, M.J."  Defendant responded, "Hey, Billy."  Defendant ran up on the porch.  Billy tried to shut the door but defendant kicked or pushed it open and pulled Billy outside.  The rest of the family stayed inside.

C. could hear yelling and fighting going on outside.  Defendant then ran inside the home.  He was wearing a dark jacket, blue jeans, and tennis shoes, and he had a large knife with a black handle and a gas can.  He said, "Hey sis, I have a surprise for you."  He poured gasoline on the couch and love seat.  Tonia told him to stop, that she loves him, and that she did not want him to do that.  Defendant responded, "Stop it."  He went over to Tonia and stabbed her.

Tonia yelled at C. to get her brothers out.  C. tried to get them but defendant grabbed her and threw her into a bedroom.  He told her "something like if you get out of this room you're going to die."  C. was afraid.  She stayed in the bedroom until she saw some flickering lights and thought the police had arrived.  When she left the bedroom, she saw the love seat and couch engulfed in flames.  She filled a large cup with water and tried to put out the flames, but it did not work.  She found J. in the kitchen and put him on her back.  She then grabbed A. and left.

North County Fire Department Chief Humberto Arista and firefighter and EMT Donald Harvey were dispatched to render medical aid to the victim of a stabbing at the Blackie Road address shortly before 1:00 a.m. on November 30, 2005.  They arrived in the area within 15 seconds as they were already nearby.  However, they did not go to the reported address because the police had not yet arrived and the protocol is to have confirmation that a crime scene has been cleared before they go in.  The neighbor, Vernon, ran toward the fire truck with a cell phone in his hand. He pointed down the road and said that two houses were on fire.  Chief Arista requested additional firefighting resources.

As Chief Arista's fire truck approached the burning structures, he and Harvey saw C. running toward them with J. and A.  The children looked scared.  Vernon yelled from the porch of his mobile home that there were two people inside who had been stabbed.  Chief Arista approached the children.  The children had soot on their faces and smelled of gasoline.  Chief Arista asked C. if there was anybody still inside the burning structures. C. said that she thought her uncle was still in there, and that her uncle had told her that if she left he would kill her.  Vernon approached the children, they went to him, and he took them inside his mobile home.

When the police arrived, Chief Arista asked the officers to secure the Silvas' home so he could provide medical assistance to two stabbing victims.  Once the home was cleared, Chief Arista entered it and saw blood in a hallway and Tonia and Billy at the end of the hall.  Tonia was sitting quietly on her knees, leaning against a door jam, naked, and cradling Billy's head on her lap.  Chief Arista directed Harvey to treat them while he isolated the children in a bedroom and sought additional help.

Harvey checked Billy for a pulse before Billy was taken to another room.  Billy had already died from two stab wounds to the left side of his lower back.  The lower stabbing had struck his adrenal gland and caused bleeding into the abdominal cavity.  The upper stabbing had passed through the chest into the center of the left lung and hit large blood vessels that supply the lung, causing him to rapidly bleed to death.  He had no defensive cut wounds.  The parties stipulated that toxicology tests later determined that Billy's blood was negative for drugs and alcohol.

Harvey administered medical aid to Tonia.  Tonia had a large stab wound to her side and appeared to be in shock, but she was able to answer Harvey's questions. Harvey dressed the wound and asked Tonia if she knew who caused it.  Tonia said her brother.  She did not ask Harvey any questions.  She was transported to the hospital for further treatment and was in shock when she arrived.  She was somewhat agitated and became more agitated during her hospitalization.  Her toxicology test came back positive for amphetamines although she denied drug use.  The stabbing had caused injuries to the right side of her liver, her right chest cavity, and her right lung.  The injuries resulted in bleeding into her chest, significant blood loss, and the partial collapse of her right lung.  She remained in the hospital for several days, and was given medication to calm her anxiety.

Tonia's mobile home burned to the ground.  The condemned house sustained damage to the front porch and door.  No human remains were found in either structure.

Elena was awakened at 6:30 a.m. on November 30, 2005, by a phone call from defendant's father in Wisconsin.  Defendant's father told Elena that defendant was being accused of

killing Billy, stabbing Tonia, and burning down their home.  He told Elena to call 911 because the police might kill defendant when they find him.  Elena told defendant, who was in bed, what his father said.  Defendant said to tell his father "not to fuck with me like this."

Elena called 911 at 7:39 a.m.  Defendant helped Elena give the police directions to their apartment.  While waiting for the police to arrive, defendant put his tennis shoes over the stove.  He told Elena that he was cleaning them because of dog excrement.  Elena later smelled defendant's tennis shoes, and they smelled to her like gasoline.  When the police arrived they arrested defendant and removed him from the apartment.  Defendant had no money in his wallet when he was booked into jail.

Officers told Elena that they were waiting for a search warrant.  Elena asked the officers if they had found a murder weapon.  The officers asked her how many knives she had.  She said she had five knives, and the officers asked her to find them.  She found four knives, but she could not find the knife she had used to cut up the onion the day before.

Defendant's tennis shoes were seized from his apartment and later tested.  The parties stipulated that both tennis shoes contained gasoline residue.  Defendant's truck was also seized and tested.  There was a streak of blood behind and above the outside handle of the rear door on the driver's side of the truck.  The parties stipulated that the blood was Tonia's.  A black jacket that was turned inside out and smelled of gasoline was sitting on the rear passenger seat of the truck.  Neither sleeve was torn but the right sleeve of the jacket had a smear of blood near the elbow.  The parties stipulated that the blood was Tonia's.  Blood was also found on the jacket's right cuff.  The parties stipulated that the blood was Billy's.  The parties also stipulated that there was DNA on the jacket indicating that defendant had worn it.
 . . .

After defendant's first trial, he was housed in county jail with James Martin.  Martin had a 1996 felony conviction for residential burglary, a 2000 misdemeanor conviction for unauthorized use of an access card, and a 2004 misdemeanor conviction for unlawfully kissing a 14-year-old girl.  Defendant noticed that Martin had the name "Tonya" tattooed on his throat.  The tattoo referred to Martin's former girlfriend Tonya Gibson.  Defendant said that it was his sister's name.  He asked if Martin was the M.J. that his niece reported seeing at her home the day Billy died. Martin said that he was not that person.

Defendant wanted to "put more blame on his sister and take it off him."  He asked Martin if he would tell a defense investigator that Martin met defendant's sister through Billy, as Martin was Billy's drug supplier; that Martin and defendant's sister flirted with each other; that they started an affair after Billy died; and that Martin had proof.  Martin refused to do it at first, but defendant said that he could have his girlfriend get Martin into a drug program and that the cost of the program would be taken care of.

Martin met with the defense investigator.  He told her that he had intimate pictures of himself and Tonia, and pictures of them with drugs, and that he could provide the pictures and a letter.  He received a subpoena to testify in defendant's second trial and $5 before he was released from jail.  The $5 was to pay for cab fare home.  A prosecution investigator met with him after he was rearrested two weeks later and asked him to verify the

information in the defense investigator's report.  Although he told that investigator the same thing he told the defense investigator, he was not able to answer some questions posed to him about Tonia.  He did not know about Tonia's children or how to get to her home, and he could not pick her photo out of a lineup.

The prosecution presented defendant's testimony from the first trial by reading it from the certified transcript. [2]

. . .

Tonia was not called by the prosecution to testify as part of its case-in-chief.  However, the defense did call Tonia to testify.

**The Defense Case**

Ralph Garcia married Tonia in late 1998 or early 1999 and, as far as he knows, they are still legally married.  They have had no contact since 1999.  Tonia admitted at trial to still being legally married to Garcia, but testified that she honestly believed they had been divorced before she married Billy in 2003.  Although her 2003 marriage license says that she had no prior marriages, she had two.

On November 29, 2005, Tonia used methamphetamine, and she and Billy argued about it.[3]. . .

Jason Read, . . . Billy's friend, spent part of November 29, 2005, at Billy and Tonia's place.  Read overheard an argument between Billy and Tonia about Tonia's use of methamphetamine that day.  After Billy died, the fire department searched the destroyed mobile home for human remains and the sheriff's department searched it for a possible murder weapon.  Later, Read found a knife blade under the mobile home's front window. He left it where it was and asked Vernon to contact the police.  Vernon turned the knife blade over to the sheriff's department. The knife blade was examined for bloodstains and DNA, but none were found. However, any DNA that had been on the blade could have been destroyed in the fire.

Donna and Vernon paid rent to defendant when they first moved into their mobile home in 1998 or 1999, and thereafter they paid rent to Tonia.  They had known Billy since he was a teenager.  On November 30, [sic] 2005, around 7:00 p.m., Vernon heard Billy and Tonia arguing.  After Donna and Vernon went to bed that night, they were awakened by a scream coming from Tonia and Billy's home.  Vernon got up and went to the living room.  Billy fell through the door.  He was injured and crying "help me."  Donna came out to the living room just as Tonia fell through the door smelling of gasoline and wrapped in a blanket, but otherwise naked.  Tonia said to call 911, that defendant had stabbed Billy and her, that he

---

[2] Defendant's testimony from his first trial is similar to his testimony at his second trial, which the Court of Appeal summarized below as part of the defense case.

[3] Here the court summarized Ms. Bone's testimony, which was essentially the same as C's testimony.

still had the children, and that the house was on fire.  Vernon called 911, and Donna got some linens to try to stop Billy's bleeding.  Vernon went outside, gathered the children, and brought them inside, and Donna took them into a bedroom.  The children had soot on their faces and smelled of gasoline.  Donna told Tonia that she had the children while Vernon tended to Billy.  Billy tried to get up several times and move away from Tonia.  Tonia did not try to comfort him.  Billy died and Tonia was taken by ambulance to the hospital.

Deputy Sheriff Benjamin Payton responded to the Blackie Road property on November 30, 2005, around 1:30 a.m., following the report of a stabbing.  He went to the Silvas' mobile home, and Vernon told him that the victims were in the back. The children were in a bedroom and Billy and Tonia were in the back hall.  Tonia was leaning against a back wall with a sheet over her.  Billy was lying in front of her with his feet toward her and was already dead.  After Officer Payton made sure the home was cleared, he allowed the fire department personnel to enter.

Jeannie Gilliam, defendant's aunt, packed up defendant's things at his apartment after he was arrested.  She found five or six steak knives and five or six utility knives of different sizes in various places in the kitchen.  Some were in the dishwasher and some were in the sink.  Elena was not able to tell Gilliam who the knives belonged to, so Gilliam took all of them.  Gilliam did not tell the police or the prosecutor's office that she found the knives because nobody asked her. Everything Gilliam took that did not belong to defendant's grandmother was taken to Goodwill.

Defendant testified in his own defense again at the second trial.  He testified that he was convicted of trespassing and fighting in public in 1995, and of battery in 1997 and again in 1998.

On November 29, 2005, he and Elena spent the day together.  After they both went to sleep, he woke up and started thinking about a job he had to do the next day.  He decided to go to Tonia's to buy methamphetamine.  When he got there, he saw his sister outside wearing a T-shirt and asked her if she had any methamphetamine.  She said that she did.  She told defendant that she and Billy [had] been arguing, that Billy had hit her, and that they were breaking up.  She first asked defendant to "fuck him up," and then said she would handle it herself.  She got up and went inside. Sirus started barking and Tonia yelled to him to be quiet.

Billy came out of the house and defendant said, "what's up, Billy."  Billy overpowered defendant and put him in a headlock.  When Billy finally released his grip, defendant spun around to hit him, but Billy said, "help me.  Help me."  Defendant saw that Billy had been stabbed and he saw Tonia drop a knife on the ground.  Tonia grabbed a gas can, poured gasoline on the front porch, and disappeared inside.  Defendant yelled at her, "What the fuck are you doing?"  He picked up the knife and chased after her.  He slipped, caught himself, and picked up the gas can.  C. came running toward him and he threw the gas can behind him. Tonia was searching for something, so defendant stopped C., told her to go to her bedroom because he did not want her to get hurt or killed, and gave her a shove.  He yelled at Tonia, "stop it. Stop it."  Tonia jumped on the couch and defendant thought she was holding something in her right hand.  He rushed her because he thought she had been looking for a weapon.  He stabbed her once, dropped the knife, and took off.

He ran out to his truck and drove home. He took off his clothes and went to bed. Elena gave him some medication and he buried his head under the covers and went to sleep. He woke up the next morning when his father called and told Elena that he was wanted for Billy's murder. Defendant realized that Tonia was placing the blame on him and he said something like, "you got to be kidding me." He stayed in bed and Elena called 911. He provided directions to the apartment. Because he was told to be dressed by the time the police arrived, and he noticed that his shoes had dog excrement on them, he tried to clean the shoes.

Defendant met James Robert Martin while he was jail, but he did not solicit Martin to help him on his case. He did not pay attention to the tattoo Martin had on his neck. Martin said that he knew Tonia, so defendant asked him if he had ever bought drugs from Billy. Martin responded affirmatively. Martin said that he had pictures of Tonia and him with drug dealers and a letter which he could give to defendant's investigator. Martin was subpoenaed to testify at trial after Martin told defendant's investigator that he had been having an affair with Tonia. Defendant told Martin that he could ask his girlfriend about getting Martin into a drug program, and defendant's grandmother provided $5 to Martin at defendant's request so Martin could buy cigarettes.

Lipska, 2009 WL 4856789, at *2-9.

# DISCUSSION

## I.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

United States District Court
Northern District of California

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  In other words, federal habeas relief is available only if the state court's application of federal law is "so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.'" Nevada v. Jackson, __ U.S. __, 133 S. Ct. 1990, 1992 (2013) (citing Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 786 (2011)).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim.  In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. Plascencia v. Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Greene v. Lambert, 288 F.3d 1081, 1088 (9th Cir. 2002).  When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. Plascencia, 467 F.3d at 1198; Himes, 336 F.3d at 853; accord Lambert v. Blodgett, 393 F.3d 943, 970 n.16 (9th Cir. 2004).

Here, as noted, the California Supreme Court summarily denied Petitioner's petition for review. The Court of Appeal, in its opinion on direct review, addressed all of the claims Petitioner raised in his state appeal and many of the claims raised in his federal petition. See Respondent's Ex. F. Thus, the Court of Appeal was the highest state court to have reviewed those claims in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews herein. Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

**II. Petitioner's Claims**

In his petition, Petitioner asserted the following grounds for relief: (1) Sixth Amendment violation based on juror bias; (2) Due Process and Confrontation Clause violations based on the trial court's exclusion of Tonia Bone's past bad acts; (3) Due Process violation based on trial court's exclusion of evidence that Ms. Bone threatened victim Billy White's life; and (4) ineffective assistance of counsel. In his traverse, Plaintiff withdraws claims one and four. See Traverse at 11. Therefore, these claims are dismissed. In his traverse, Petitioner requests an evidentiary hearing on claims two and three. Also, in his traverse, Petitioner raises for the first time the following two constitutional claims: (1) the exclusion of the evidence of Ms. Bone's prior bad acts violated Petitioner's Sixth Amendment right to a trial by jury; and (2) the exclusion of the prior bad acts evidence violated Petitioner's right to a fair trial by reducing the prosecutor's burden of proving guilt beyond a reasonable doubt. These claims appear to be unexhausted because they are not presented in Petitioner's appeal briefs to the state Court of Appeal or the state Supreme Court, they are not addressed in the state appellate court opinion and Respondent does not address them. This Court need not decide whether these claims were exhausted because, for the reasons discussed below, they are denied on their merits. See 28 U.S.C. § 2254; Cassett v. Stewart, 406 F.3d 614, 623-24 (9th Cir. 2005) (on habeas review, court may deny unexhausted claim if it is clear that petitioner does not raise even a colorable federal claim).

**A. Exclusion of Evidence (Claims 2 and 3)**

Petitioner argues that his due process right to present a complete defense and his Sixth Amendment right to cross-examine the witness against him were violated when the trial court

United States District Court
Northern District of California

excluded, under the California Evidence Code, in particular section 352, evidence that Ms. Bone had committed thirty-five prior acts of threats and violence, including evidence that Ms. Bone previously had threatened Mr. White.[4]  Petitioner summarizes these acts as follows: seventeen incidents involved Ms. Bone's threat of force; six involved setting fires or threats to set fires; six incidents involved Ms. Bone's lies or acts of moral turpitude; three incidents involved false accusations or threats of false accusations.  Petitioner argues that this evidence would have: (1) shown Ms. Bone's character traits and state of mind for violence and setting fires; (2) impeached Ms. Bone's credibility and (3) supported his defense that Ms. Bone stabbed Mr. White and set fire to her house.

### 1. Court of Appeal Opinion

The Court of Appeal rejected this claim as follows:

> During in limine motions before each trial, the prosecutor sought to exclude and/or defendant sought to admit evidence of 35 bad acts by Tonia that defendant specifies in his opening brief.  Many of the acts involved Tonia's two prior husbands or family members other than defendant, and they occurred many years prior to the stabbing incident at issue in this case.  FN6  Some of the acts occurred after the stabbing incident.  Defendant generally characterizes the incidents as follows: "At least 17 of these incidents involved Tonia's prior use of force or violence. . . . At least 17 of these incidents involved Tonia's threat of force. . . . Six of these incidents involved setting fires, or threatening to set fires . . . . At least six of these incidents involved lies or acts of moral turpitude. . . . At least three of these incidents involved false accusations, or threats of false accusations."  FN7  Defendant sought admission of the evidence as support for his third-party-culpability defense.  The prosecutor argued, in part, that a third-party-culpability defense could not be presented based solely on evidence of a victim's bad character.

> FN6:   They appeared to occur between 1995 and 1998.

> FN7:  We see no reason to further describe the alleged bad acts here, as the parties are familiar with the proffered evidence and it would not add anything to our discussion of the issue.

> The court ruled prior to the first trial as follows: "At this time the Court is going to deny the defense motion and grant the People's motion that Tonia Bone's character not be put in.  [¶]  My feelings about the situation are as follows:  Most of this proposed evidence

---

[4] California Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

concerning Tonia Bone's character, what I would regard the propensity evidence, evidence suggesting she also has a disposition to commit the crimes that are alleged, going to be alleged that she committed which are not admissible pursuant to [section] 1101 of the Evidence Code, I feel that the reference of some of it is marginal due to the time that's passed and, in fact, we are talking about different relationships." "Its relevance is marginal compared with the likelihood that it would mislead and confuse the jury. And certainly there is an undue consumption of time apparently, obviously, just by today's proceedings we spent more time talking about Tonia Bone than what took place on the day in question." "I'm ruling it's not admissible because I believe that it's going to mislead and confuse the jury, and it's going to take up an undue amount of time. And that for those reasons, along with any others that I may have indicated that I don't think it's appropriate, it's not-it's going to take the trial down the track that's not appropriate."

The parties submitted the matter to the trial court again before the second trial. At that time, the court ruled: "Well, again, the Court's ruling was based on the [Evidence Code section] 352 argument as much as anything. I believe that we would spend more time talking about things that happened in the past, ultimately, both not only but past in regard to Ms. Bone but then, obviously, in terms of Mr. Lipska that we spend a lot more time talking about that kind of thing and litigating that matter than we would about what took place on the day in question, which is what we would like the jury to focus on. [¶] I think it has a real tendency to mislead the jury, to get the focus away from the issue they should be concerned about, which is what took place on the day in question. For those reasons, and for the reasons the Court stated previously when Mr. Murphy argued the motion, the Court's going to grant the motion to exclude evidence of Tonia Bone's character, other than things that may have taken place at or near the time in question."

Defendant now contends that the trial court erred when it excluded all 35 of the proffered bad acts. He argues that the evidence should have been admitted (1) under Evidence Code section 1101, subdivision (b), to prove identity and that Tonia had the motive, intent, and state of mind to commit the murder of White and the attempted murder of her three children by arson; (2) under Evidence Code section 1101, subdivision (c), to impeach Tonia's credibility; (3) under Evidence Code section 1103, subdivision (a)(1), to prove that Tonia, an alleged victim, had the character trait of violence and that she acted in conformity with that character trait; and (4) under Evidence Code section 1109 to show Tonia's prior acts of domestic violence. Defendant contends that the exclusion of this evidence was prejudicial because the prosecution failed to introduce any evidence of why defendant would kill Billy and attempt to kill the children, because no witness testified to seeing defendant stab Billy, and because Tonia was the only witness to testify that defendant actually lighted the fire that burned down her home.

The Attorney General contends that the trial court properly excluded the proffered evidence as more prejudicial than probative under Evidence Code section 352. The Attorney General further contends that the proffered evidence was not admissible to prove third-party culpability.

In the recent case of <u>People v. McWhorter</u> (2009) 47 Cal. 4th 318, our Supreme Court discussed the well-settled rules regarding the admission of third-party-culpability evidence: "'"We repeatedly have indicated that, to be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his

or her guilt, must link the third person either directly or circumstantially to the actual perpetration of the crime.  In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352.' [Citations.]" (People v. Bradford (1997) 15 Cal. 4th 1229, 1325 .) [¶]  In People v. Hall (1986) 41 Cal. 3d 826, we held that 'the third-party evidence need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt.' (Id. at 833.) 'Our holding [in Hall ] did not, however, require the indiscriminate admission of any evidence offered to prove third-party culpability.  The evidence must meet minimum standards of relevance: "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." [Citation.] We also reaffirmed that such evidence is subject to exclusion under Evidence Code section 352. [Citation.]' [Citation.]" (McWhorter, 47 Cal. 4th at 367-368.)

"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time.  [Citation.]  Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (People v. Rodrigues (1994) 8 Cal. 4th 1060, 1124-1125; People v. Rodriguez (1999) 20 Cal. 4th 1, 9-10.)

The McWhorter court continued: "[I]n People v. Farmer (1989) 47 Cal. 3d 888, we specifically addressed the application of Evidence Code section 1101 to proposed evidence regarding prior criminal conduct of a third party alleged to have committed the charged offense.  The defendant in Farmer offered evidence of a third party's history of violent crime, on the theory that it tended to identify him as the perpetrator.  We noted under Hall, evidence linking a third person to the actual perpetration of the crime should be treated like any other evidence.  [Citation.]  We went on to hold, however, that the proffered evidence was properly excluded under Evidence Code section 1101, because it was offered not to show a fact other than the third party's criminal disposition, such as motive or intent, but merely to show that the third party was the more likely perpetrator because he had a history of violence.  [Citation.]  Such evidence does not amount to direct or circumstantial evidence linking the third person to the actual perpetration of the crime.  [Citation.]" (McWhorter, 47 Cal. 4th at 372-373.)

In this case, as in Farmer, defendant offered evidence of Tonia's history of violent conduct on the theory that it tended to identify her as the person who stabbed Billy and set fire to their mobile home with the children inside.  And, as in Farmer, the proffered evidence was properly excluded under Evidence Code section 1101, because it was offered to show that Tonia was the more likely perpetrator because of her history of violence.  "'Such evidence does not amount to direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' [Citation.]" (McWhorter, 47 Cal. 4th at 373.)

In addition, we cannot say that the trial court exercised its Evidence Code section 352 discretion "in an arbitrary, capricious or patently absurd manner that resulted in a manifest

13

miscarriage of justice."  (People v. Rodrigues, 8 Cal. 4th at 1125.)  Most of the proffered testimony concerned acts by Tonia that allegedly occurred years before the incident at issue and that had nothing to do with Tonia's relationship with defendant, with Billy, or with Tonia's children.  In addition, some of the proffered testimony was so nonspecific that it would require a mini-trial on the circumstances surrounding the alleged bad acts.  This would require an undue consumption of time, and would confuse or mislead the jury, or focus their attention away from the testimony regarding what occurred on the night of November 29 and 30, 2005.  Thus, the trial court acted well within its discretion to exclude all the proffered testimony under Evidence Code section 352.  FN8

FN8:  As we have found that the court properly excluded the testimony under Evidence Code section 352, we need not address defendant's contentions that the testimony was admissible under Evidence Code sections 1103 or 1109.

We further find that exclusion of all of the proffered testimony did not rise to the level of an unconstitutional deprivation of the right to present a defense. "Application of the ordinary rules of evidence such as Evidence Code section 352, generally does not deprive the defendant of the opportunity to present a defense [citation]. . . ." (People v. Snow (2003) 30 Cal. 4th 43, 90.) "Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (People v. Fudge (1994) 7 Cal. 4th 1075, 1103.)

In this case, other evidence of Tonia's bad character and bad acts was admitted. Defendant's testimony from the first trial, which was read to the jury at the second trial, included testimony regarding "problems" between defendant and Tonia when they were growing up together.  Defendant testified that at various times when they were children, Tonia had spit in his face, cut him with a knife, and hit him with a bar stool.  Defendant also testified that he stopped seeing Tonia and Billy sometime before the incident in question because they were using methamphetamine, that Tonia appeared to be under the influence of methamphetamine when defendant arrived at her home that night, and that she asked defendant to "kick [Billy's] ass." Ralph Garcia testified that Tonia was still married to him at the time she married Billy in 2003, and Tonia testified that her 2003 marriage license states that she had no prior marriages even though she had been married twice before.  There was testimony that Tonia and Billy argued about her use of methamphetamine that day. And, both Vernon and Donna testified that Tonia did not appear to comfort or aid Billy prior to the arrival of medical attention, and that Billy tried to move away from Tonia while Vernon was tending to him.  After reviewing the entire record, we find that the trial court's ruling excluding the proffered evidence of the 35 bad acts at issue did not deprive defendant of the opportunity to present his third-party-culpability defense.  (People v. Snow, 30 Cal. 4th at 80; People v. Fudge, 7 Cal. 4th at 1103.)

Lipska, 2009 WL 4856789, at *14-17.

## 2.  Due Process Claim

### a. Federal Authority

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling

14

violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fair trial guaranteed by due process.  Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Jammal, 926 F.2d at 919.  While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated.  Perry v. Rushen, 713 F.2d 1447, 1453 (9th Cir. 1983).

"State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (citations omitted); see also Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (due process does not guarantee a defendant the right to present all relevant evidence).  "The introduction of relevant evidence can be limited by the State for a "valid" reason.  Id. at 53.  But this latitude is limited by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments.  Holmes, 547 U.S. at 324.  Due process is violated only where the excluded evidence had "persuasive assurances of trustworthiness" and was "critical" to the defense.  Chambers v. Mississippi, 410 U.S. 284, 302 (1973); Perry v. Rushen, 713 F.2d 1447, 1455 (9th Cir. 1983); DePetris v. Kuykendall, 239 F.3d 1057, 1063 (9th Cir. 2001).  "Only rarely [has the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence."  Jackson, 133 S. Ct. at 1992.

### b. Analysis

The California Court of Appeal's rejection of Petitioner's due process claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).  The state appellate court reasonably determined that the trial court was within its discretion in excluding the evidence on the grounds that its probative value was outweighed by the undue consumption of time and the risk of confusion to the jury.  As noted by the appellate court, most of the incidents occurred

between 1995 and 1998, many years before November 2005 when the crimes at issue occurred. Additionally, many of the incidents involved other people, including Ms. Bone's two former husbands, her mother, and family members other than Petitioner.  The allegations that Ms. Bone committed violent acts and threatened people in the past were not relevant to her actions on the night of November 30, 2005.  See Holmes, 547 U.S. at 327 (evidence of third party guilt properly may be excluded where the evidence is speculative or remote, or does not tend to prove or disprove a material fact at issue).

Furthermore, much of the evidence was based on hearsay and, as noted by the appellate court, mini-trials would have been necessary to determine if the evidence could be admitted.  See id. at 326-27 ("well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury"); accord, Jackson, 133 S. Ct. at 1993-94 (no Supreme Court decision has held that it is unconstitutional to exclude extrinsic evidence of a witness' conduct to impeach the witness's credibility which may confuse the jury, unfairly embarrass the victim and unduly prolong the trial).

Nor was the "prior bad acts" evidence critical to the defense, because the court allowed Petitioner to present substantial other evidence of Ms. Bone's bad character.  For instance, the jury heard Petitioner's testimony from the first trial that, when they were growing up together, Ms. Bone had hit Petitioner with a stool, cut him with a knife and spit in his face.  Evidence was admitted that Ms. Bone used methamphetamine and that she had used methamphetamine on November 29, 2005.  The jury heard testimony that Ms. Bone and Mr. White had an argument that day, about Ms. Bone's use of methamphetamine.  Ralph Garcia testified that Ms. Bone was still married to him at the time she married Mr. White in 2003 and Ms. Bone admitted that her 2003 marriage license stated that she was not formerly married even though she had two previous marriages.  This evidence put Ms. Bone's credibility and character in question.

Furthermore, Vernon and Donna Silva both testified that Ms. Bone did not appear to aid or comfort Mr. White after they had been stabbed and were waiting at the Silvas' house for medical personnel to arrive.  The Silvas also testified that Mr. White appeared to move away from Ms.

United States District Court
Northern District of California

16

1    Bone at their house, which contradicted the prosecution evidence that Ms. Bone was cradling Mr.

2    White in her arms as he lay dying.  The Silvas' testimony was corroborated by Deputy Sheriff

3    Benjamin Payton, who first entered the Silva home and saw Mr. White lying many feet away from

4    Ms. Bone.

5         Thus, the state appellate court reasonably concluded that the exclusion of evidence of Ms.

6    Bone's alleged bad acts did not deprive Petitioner of the opportunity to present his defense that

7    Ms. Bone stabbed Mr. White and set fire to her mobile home.

8                                    **c. Prejudice**

9         Respondent argues that, even if the exclusion of the evidence of Ms. Bone's prior bad acts

10   was constitutional error, there was no prejudice.  Petitioner argues that he was prejudiced by the

11   exclusion of this evidence.  In order to warrant federal habeas relief a due process violation must

12   have a substantial and injurious effect or influence in determining the jury's verdict.  Brecht, 507

13   U.S. at 637.

14        The prosecution's case against Petitioner was strong.   Ms. Bone's daughter, C, was the

15   prosecution's main witness.  C. was eleven years old when the stabbing incidents took place and

16   thirteen when she testified at Petitioner's trial.  RT (Vol. 5) 1205-79.

17        C. testified to the following.  She lived in a mobile home with her mother, Ms. Bone, her

18   step-father, Mr. White, and her younger brothers.  Her brothers J., age three, and A., age one, were

19   present on the night of the stabbing incidents.  RT 1223-24.  A third younger brother was at his

20   grandmother's house that night.  RT at 1212.  On the night of the incidents, the family fell asleep

21   in the living room while watching a children's movie.  RT 1213.  C. was woken by her mother

22   stepping on her foot and the dog, Sirus, barking.  RT 1214.  Her mother went to the window, saw a

23   man approaching and thought it was their friend, M.J.  RT 1215.  Mr. White went to the door to let

24   M.J. in, but then tried to close it.  RT 1216-18.  The person on the outside pushed the door open

25   and pulled Mr. White outside.  RT 1218-19; 1252, 1255-56.  The rest of the family stayed inside

26   in the living room.  RT 1219.  C. heard noises outside, but she didn't know what they were.  RT

27   1219; 1260.

28        Then C. saw Petitioner, who is her uncle, run inside the home and pour gasoline on the

United States District Court
Northern District of California

17

1  loveseat in the living room.  RT 1220-21.  He was wearing a big jacket and blue jeans.  RT 1222.

2  He had a long knife with a black handle.  RT 1220-21; 1260.  He said, "Hey sis, I have a surprise

3  for you."  RT 1222.  He also said, "Stop it."  RT 1263.  Ms. Bone told him to stop.  RT 1221.

4  Then Petitioner went over to Ms. Bone, who was on the couch, and stabbed her.  RT 1222.  Ms.

5  Bone yelled at C. to get her brothers out.  RT 1223.  C. tried to get her brothers, but Petitioner

6  grabbed her and threw her into a bedroom.  RT 1224; 1264.  He told C. something like, "if you get

7  out of this room you're going to die."  RT 1225.  C. stayed in the bedroom until she saw flickering

8  lights outside and thought the police had arrived so that it would be safe to leave the bedroom.  RT

9  1225-26.  In the living room, she saw that the couch and love seat were on fire and tried to put the

10  fire out with cups of water.  RT 1226. When C. realized that she could not put the fire out, she

11  found her two brothers and left the mobile home.  RT 1226-27.  When she left the home, she saw

12  firemen in the driveway.  RT 1229.  She and the boys were taken to the Silvas' residence next

13  door.  RT 1230-31.  C. only saw her mother as she was being taken out of the Silvas' home on a

14  stretcher and she only was able to say "bye" to her.  RT 1232.  Her mother did not say anything to

15  her.  RT 1232.

16      C.'s testimony was particularly damaging to Petitioner because it was corroborated by the

17  testimony of Fire Chief Humberto Arista and Detective Steve Villegas.

18      Fire Chief Arista and firefighter Donald Harvey arrived quickly at the scene and, as they

19  approached the mobile home, which was on fire, they saw C. running toward them with J. and A.

20  RT (Vol. 4) 927.  Arista asked C. if there was anybody inside the building and she said she

21  thought her uncle, Petitioner, was still inside and that he had told her that if she left he would kill

22  her.  RT 929.

23      C. was interviewed the night of the incident by Detective Steve Villegas.  RT (vol. 5)

24  1237; 1937.  C.'s description of events to Detective Villegas matched her trial testimony.  RT

25  (Vol. 7) 1947-49.

26      In his closing argument, defense counsel argued that C. was mistaken about events on the

27  night of the stabbing because Ms. Bone told her what to say.  RT (Vol. 9) 2459.  He argued that

28  "C.'s  story evolved into her mom's story."  RT 2460.  This argument is specious because the

1    testimony of Fire Chief Arista and Detective Villegas corroborated what C. told the jury.  In

2    particular, C. was interviewed by Detective Villegas immediately after the events took place,

3    before C. had a chance to speak to her mother about what happened that night.  In fact, Ms. Bone

4    was in the hospital being treated for her stab wound at the time Detective Villegas interviewed C.

5          Furthermore, other evidence incriminated Petitioner.  He did not deny he was at Ms.

6    Bone's house and admitted he stabbed her.  However, when he got home, he told Elena Gutierrez,

7    his live-in girl friend, that "it was good to get some fresh air," and went to sleep.  In the morning,

8    even though he admittedly had stabbed his sister the previous evening, he acted surprised to learn

9    he had been implicated in the events at his sister's house.  Furthermore, C.'s description of the

10   knife that Petitioner used to stab Ms. Bone matched the description of the knife that Ms. Gutierrez

11   had used to cut up onions for dinner on the evening of November 29.  When Ms. Gutierrez and the

12   police searched the apartment for that knife the next day, they could not find it.  Also, the fact that

13   blood matching the blood of Ms. Bone and Mr. White was found on Petitioner's jacket provided

14   strong physical evidence that Petitioner had stabbed both victims.

15         Furthermore, Petitioner's version of events was not credible.  Petitioner testified that he got

16   up in the middle of the night to buy methamphetamine from Ms. Bone, although he had no money

17   in his wallet.  He testified that, when he arrived at Ms. Bone's house in the middle of the night,

18   she was sitting outside wearing only a tee shirt, although it was cold enough for him to wear a

19   jacket.  Many witnesses testified that Ms. Bone had a blanket wrapped around her and was

20   wearing no clothes underneath it.  Petitioner testified that, as he was standing in the yard outside

21   the mobile home, Mr. White came out and put a choke hold on him, for no apparent reason and

22   after Mr. White had been fatally stabbed by Ms. Bone.  Petitioner testified that Ms. Bone dropped

23   the knife she had allegedly used to stab Mr. White, but then went into the living room to look for a

24   weapon and Petitioner stabbed her because he thought she had found another weapon.  Petitioner

25   admitted throwing his niece, C., in a bedroom, allegedly for her own safety.  However, he did not

26   explain why he left eleven-year old C. and his two young nephews in the house alone after both

27   their parents had been stabbed.

28         Petitioner argues that this was a close case because (1) except for the child endangerment

United States District Court
Northern District of California

19

1    charges, the first jury could not come to a unanimous decision on any other charge; (2) the second

2    jury deliberated five-and-one-half days before reaching a decision on the remaining charges; (3)

3    no evidence showed he had a motive to kill Mr. White or attempt to murder the children; (4) no

4    witness testified to seeing Petitioner stab Mr. White; and (5) Ms. Bone was the only witness to

5    testify that Petitioner lit the fire that burned down the mobile home.

6        The length of jury deliberations is a factor that is considered in evaluating the prejudice

7    resulting from an alleged error. Jennings v. Woodford, 290 F.3d 1006, 1019 (9th Cir. 2002);

8    Mayfield v. Woodford, 270 F.3d 915, 932 (9th Cir. 2001). However, in this case, the length of the

9    jury deliberations cannot overcome the evidence presented at trial, which overwhelmingly pointed

10   to Petitioner's guilt. Petitioner's defense, which was not credible, did not diminish the strength of

11   the prosecutor's evidence against him. Although the prosecutor's case would have been stronger

12   had there been evidence of a motive or an eyewitness to the stabbing of Mr. White, this evidence

13   was not necessary to prove the charges against Petitioner. Furthermore, C.'s testimony was strong

14   evidence that Petitioner was the person who stabbed Mr. White outside the mobile home because,

15   according to C., the only other possible suspect, Ms. Bone, never left the living room.

16        Therefore, even if the exclusion of the alleged prior bad acts evidence rose to the level of a

17   due process violation, given the strength of the prosecutor's case, the error did not have a

18   substantial or injurious effect or influence on the jury's verdict.

19        The state Court of Appeal reasonably denied Petitioner's due process claim.

20                 **2. Confrontation Claim**

21                   **a. Federal Authority**

22        The Confrontation Clause guarantees an opportunity for effective cross-examination, but

23   not cross-examination that is effective in whatever way, and to whatever extent, the defense might

24   wish. Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam). Accordingly, "trial judges

25   retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits

26   on such cross-examination based on concerns about, among other things, harassment, prejudice,

27   confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally

28   relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). Generally speaking, a court

*United States District Court*
*Northern District of California*

violates the Confrontation Clause only when it prevents a defendant from examining a particular and relevant topic.  Fenenbock v. Director of Corrections, 692 F.3d 910, 919 (9th Cir. 2012).  A defendant meets his burden of showing a Confrontation Clause violation by showing that "[a] reasonable jury might have received a significantly different impression of [a witness'] credibility had . . . counsel been permitted to pursue his proposed line of cross-examination."  Van Arsdall, 475 U.S. at 680; Slovik v. Yates, 556 F.3d 747, 753 (9th Cir. 2009).  The focus of this inquiry "must be on the particular witness, not on the outcome of the entire trial," Van Arsdall, 475 U.S. at 680, such that defense counsel's ability to impeach other witnesses "is irrelevant" to whether the trial court violated the Confrontation Clause, Slovik, 556 F.3d at 754-55.

A claim that a defendant's Confrontation Clause rights were violated by restrictions on cross-examination is judged under the trial error standard.  Van Arsdall, 475 U.S. at 684.  This means that even if a reviewing court finds a constitutional violation, the verdict stands if the violation's effect on the trial is sufficiently weak.  Id.  On direct appeal, the test is whether the trial court's error was "harmless beyond a reasonable doubt."  Chapman v. California, 386 U.S. 18, 24 (1967).  On habeas review, the test is whether the error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht, 507 U.S. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  Either way, the inquiry considers factors beyond the effect of the restriction on the cross-examination of the individual witness.  Van Arsdall, 475 U.S. at 684.  The reviewing court must assume that "the damaging potential of the cross-examination" was "fully realized," then imagine the effect on the trial as a whole.  Id.  Factors bearing on the effect of excluded testimony include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  Id.

### b. Analysis

Because the state court did not address this claim, the Court conducts an independent review of the record to determine whether the state court's decision was an objectively unreasonable application of Supreme Court authority.

1    Although trial courts have a great deal of latitude to impose reasonable limits on cross-

2  examinations based on concerns about harassment, prejudice, confusion of the issues or

3  interrogation that is repetitive or only marginally relevant, here the trial court's exclusion of all of

4  Petitioner's evidence of Ms. Bone's alleged prior bad acts could have significantly limited the

5  jury's impression of Ms. Bone's character and credibility.   Even the admission of some of the

6  evidence proffered by Petitioner would likely have affected the jury's view of Ms. Bone.

7  Therefore, it is likely that the trial court's exclusion of all of Petitioner's proffered prior bad acts

8  evidence violated his rights under the Confrontation Clause to cross-examine Ms. Bone.

9    However, even if a constitutional violation was committed, there was no prejudice.   The

10 <u>Van Arsdall</u> factors support this conclusion.  First, the prosecution's case against Petitioner was

11 strong and Petitioner's defense was weak and not credible.  Second, Ms. Bone's testimony was not

12 important to the prosecution's case because C. was the prosecution's main witness.  The

13 prosecutor did not even call Ms. Bone to testify in its case-in-chief.  And, as discussed previously,

14 C.'s testimony was corroborated by the testimony of Fire Chief Arista and by the fact that, when

15 she was interviewed by Detective Villegas immediately after the crimes occurred, her description

16 of the events matched the testimony she gave in court.   Third, although the testimony of Ms. Bone

17 and the testimony of C. differed on minor points, C.'s testimony corroborated the important

18 aspects of Ms. Bone's testimony.   Fourth, the trial court allowed in some evidence impacting Ms.

19 Bone's credibility and character.  For instance, the jury heard that she had attacked Petitioner

20 when they were children, that she used methamphetamines in general and on the night of the

21 stabbings, that she had argued with Mr. White on the day he was murdered and that she had lied

22 about her previous two marriages.

23    Given that the trial court admitted evidence that was relevant to Ms. Bone's character and

24 credibility and the overwhelming weight of the evidence pointed to Petitioner's guilt, even if the

25 exclusion of the alleged prior bad acts evidence rose to the level of a Confrontation Clause

26 violation, the error did not have a substantial or injurious effect or influence in determining the

27 jury's verdict.

28    Therefore, the Court of Appeal's rejection of this claim was reasonable.

United States District Court
Northern District of California

22

**B. Unexhausted Claims**

**1. Right to Trial by Jury**

In his traverse, Petitioner argues that his Sixth Amendment right to a trial by jury was violated because the trial court's exclusion of the prior bad acts evidence took the decision about his guilt away from the jury.  He contends that the Court of Appeal's decision mocks this right because "[u]nder the guise of balancing collateral considerations" such as time, specificity, jury confusion and reliability of the evidence, the court usurped "the jury's exclusive prerogative as the trier of fact to assess credibility and weigh evidence and arrogates this power to the court itself." Traverse at 23.  Because this argument was not presented to the state court, this Court may deny it if is not a colorable claim; in other words, that it is perfectly clear that it does not warrant habeas relief.  See Cassett, 406 F.3d at 624.

The Sixth Amendment affords criminal defendants the right to trial by an impartial jury from the state and district in which the defendant allegedly committed the crime.  The right to a jury trial applies to state criminal trials through the Due Process Clause of the Fourteenth Amendment.  Duncan v. Louisiana, 391 U.S. 145, 149 (1968).

Petitioner cites many Supreme Court cases for the general rule that the Constitution guarantees criminal defendants the right to a trial by jury, which includes the jury's ability to make credibility determinations.  See e.g., United States v. Scheffer, 523 U.S. 303, 313 (1998) ("Determining the weight and credibility of witness testimony, therefore, has long been held to be the 'part of every case that belongs to the jury . . .'"); United States v. Bailey, 444 U.S. 394, 414-15 (1980) (same).  However, as discussed above, the Supreme Court has held that state rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials, Holmes, 547 U.S. at 324, and due process does not guarantee a defendant the right to present all relevant evidence, Egelhoff, 518 U.S. at 42.   Although this rulemaking latitude is limited by "evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve, . . . well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Holmes, 547

U.S. at 324, 326 (internal citations omitted).  In particular, there is nothing unconstitutional about rules excluding evidence of third-party guilt that is remote and lacks a connection with the crime, or does not tend to prove or disprove a material fact in issue.  Id. at 327.

Petitioner cites no Supreme Court case holding that a state's evidentiary rules excluding certain evidence impinges upon the defendant's right to a trial by jury.   For this reason alone, Petitioner's claim is not even colorable.  See Ponce v. Felker, 606 F.3d 596, 604 (9th Cir.  2010) (quoting Wright v. Van Patten, 552 U.S. 120, 126 (2008))  ("If Supreme Court cases 'give no clear answer to the question presented,' the state court's decision cannot be an unreasonable application of clearly established federal law.").

Furthermore, as noted above, even if the exclusion of Petitioner's evidence of Ms. Bone's alleged prior bad acts was improperly excluded, the prosecution's case strongly pointed to Petitioner's guilt such that the error would not have had a significant or injurious effect or influence in determining the jury's verdict.  For this reason also, Petitioner's claim lacks merit and must be denied.

### 2. Prosecution's Burden of Proof

Petitioner also argues that the exclusion of the evidence of Ms. Bone's prior bad acts reduced the prosecution's burden to prove guilt beyond a reasonable doubt because, in addition to proving his defense of third-party guilt, he "had to overcome collateral considerations of judicial economy, likelihood of jury confusion and reliability of witnesses."  Traverse at 25.

The prosecution bears the burden of proving all elements of the charged offenses beyond a reasonable doubt.  Sullivan v. Louisiana, 508 U.S. 275, 278 (1993).  However, in this case, there is no support for Petitioner's claim that the exclusion of his evidence reduced the prosecutor's burden of proof.   As discussed above, established Supreme Court authority holds that state rulemakers have broad latitude under the Constitution to establish rules excluding certain evidence from criminal trials.  See e.g., Holmes, 547 U.S. at 324.  Petitioner has cited no Supreme Court case holding otherwise nor does he argue that the jury failed to receive the proper instructions that it must find guilt beyond a reasonable doubt.  For these reasons, and because the prosecution's case was strong such that the exclusion of the evidence did not cause a substantial or injurious

United States District Court
Northern District of California

effect on the jury's verdict, this claim is unmeritorious and is denied.

## III. Evidentiary Hearing

Citing Earp v. Ornoski, 431 F.3d 1158, 1167 (9th Cir. 2005), Petitioner, in his traverse, requests an evidentiary hearing.  Petitioner argues that he is entitled to an evidentiary hearing because he has established a colorable claim for relief and the state court never accorded him a hearing.

In Earp, the Ninth Circuit stated:

> Because a federal court may not independently review the merits of a state court decision without first applying the AEDPA standards, a federal court may not grant an evidentiary hearing without first determining whether the state court's decision was an unreasonable determination of the facts . . . .  Accordingly, where the petitioner establishes a colorable claim for relief and has never been afforded a state or federal hearing on this claim, we must remand to the district court for an evidentiary hearing . . . .  In other words, a hearing is required if: '(1) [the defendant] has alleged facts that, if proven, would entitle him to habeas relief, and (2) he did not receive a full and fair opportunity to develop those facts."

Id. at 1166-67 (footnote and citations omitted).  To show a colorable claim, a petitioner must "allege specific facts which, if true, would entitle him to relief."  Id. at 1167 n.4.

Petitioner does not specify which facts entitle him to relief.  Although habeas relief may be granted if the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, see 28 U.S.C. § 2254(d)(2), here the determination of the facts was not at issue.  The state court ruled, in effect, that, even if the facts regarding Ms. Bone's alleged prior bad acts were true, they could not be admitted, for the reasons discussed above.  This Court has found that the state court's decision was not objectively unreasonable.  Most importantly, this Court has found  that, even if exclusion of the evidence rose to the level of a constitutional violation, the prosecution's case against Petitioner was so strong that the violation did not cause a substantial or injurious effect in determining the jury's verdict.  Because Petitioner has not alleged specific facts which, if true, would entitle him to relief, he is not entitled to an evidentiary hearing.

Accordingly, Petitioner's request for an evidentiary hearing is denied.

**IV.     Certificate of Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  Id. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability is denied.

## CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED**.

Dated: October 20, 2013

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California